39 C.C.P.A. (Patents)

## Application of JURGELEIT.

**Patent Appeal No. 5823.**

United States Court of Customs
and Patent Appeals.
Jan. 29, 1952.

Elmer Stewart, Washington, D. C. (Henry P. Truesdell, New York City, of counsel), for appellant.

E. L. Reynolds, Washington, D. C. (J. Schimmel, Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Judges.

GARRETT, Chief Judge.

By this appeal appellant seeks reversal of the decision of the Board of Appeals of the United States Patent Office affirming the rejection by the Primary Examiner of all the claims, numbered respectively 4, 9, and 10, in appellant's application, serial No. 717,230, for a patent "For Molding Apparatus."

In the specification it is said: "One use to which my improved method and apparatus are particularly applicable is in the manufacture of vibration dampers. Such dampers are constructed with a central metal hub and outer concentric pulley or sleeve spaced from the hub, the space being filled with a ring of rubber, or the like,

which fastens the parts together. In this way the outer pulley is cushioned on the inner hub by the rubber separating ring so that there is a tendency for the parts to absorb vibration."

The pulleys which may be made on the apparatus defined in appellant's specification and drawings apparently are designed for use in various kinds of mechanisms in which it is desired to modify vibration.[1]

It is said, in substance, in appellant's specification that, prior to his development, pulley vibration dampers were "manufactured by assembling the two concentric parts [hub and rim] on a conventional injection mold and then injecting rubber between the parts to join them together"; that his method of manufacture "required the parts [of the apparatus] to be made to extremely close manufacturing tolerances since they must fit tightly against the platen surfaces of the mold to permit injection of the rubber compound without the formation of excessive flash"; and that unless the parts were machined accurately to the same thickness they could not be assembled properly on the mold and might be displaced during the molding operation so that a defective product resulted.

The specification declares that appellant "overcomes the aforementioned difficulties by providing a molding apparatus so constructed and arranged as to accommodate parts of varying thicknesses so that they may be quickly and accurately assembled in position and the molding operation performed without excessive flash or displacement of the parts," thus rendering it "unnecessary to machine the parts to close tolerances." The claims read:

"4. Molding apparatus comprising, in combination, a support provided with guide means, a platen movable on said guide means, a plate carried by said platen and being movable relative to the platen, spring means biasing the plate for movement in one direction, a second platen moveably mounted on said guide means, a cylinder carried by said second platen and having an opening therein, said cylinder having a bearing surface cooperating with both the first mentioned platen and said plate for clamping work pieces therebetween against said surface in predetermined position, and a piston carried by said support and cooperating with said cylinder for forcing moldable material in said cylinder through said opening into a space between the work pieces.

"9. In molding apparatus a support, a platen moveable relative to said support for supporting a work piece, a member carried by said platen and being movable relative thereto for supporting a second work piece, a second platen movably mounted on said support, a cylinder for holding moldable material carried by said second platen and having an opening therein, said cylinder being provided with both a bearing surface co-operating with the first mentioned platen and said member for clamping the work pieces therebetween in alignment against said surface, a piston carried by said support cooperating with said cylinder to force moldable material through said opening into engagement with the work pieces, and means for moving the first and second platens toward the piston.

"10. In molding apparatus, a support provided with guide rods, a platen movable along said guide rods, a member carried by said platen and being movable relative thereto, spring means biasing the member for movement in one direction, a second platen movably mounted on said guide rods, a cylinder for holding moldable material supported on said second platen, said cylinder having an opening therein and a bearing surface cooperating with both the first mentioned platen and said member for clamping work pieces therebetween in alignment with said surface, a cross-bar fixed to said guide rods, a piston carried by said cross-bar for cooperation with said cylinder, and means for moving said first and second platen toward said piston so that the piston enters the cylinder to force moldable material in the cylinder through said opening into engagement with the work pieces."

1. During the oral argument before us counsel for appellant suggested an automobile fan belt pulley as a product example.

As may be seen from the claims appellant's apparatus embodies the combination of two platens, one carrying a separately movable plate, and the other, a cylinder, carried on an arm, with which cylinder a piston cooperates. The cylinder has a bearing surface that cooperates with both the first platen and the plate thereon by means of which the work pieces are clamped between the platen and the plate.

The following patents were cited as references. Shaw, 1,919,534, July 25, 1933, Berry, 2,193,787, Mar. 19, 1940.

The apparatus described in the Shaw patent comprises a platen which carries one part of a two-part mold. The platen is vertically movable in the device so that there may be an adjustment of the two parts by which a mold cavity is formed. The second part is provided with a cylindrical portion, carried on an arm, the portion being for the moldable material. The cylindrical portion cooperates with a plunger to force the material into the mold cavity through an opening at the bottom of the cylinder. A downward movement of the platen separates the mold parts, ejects the molded material from the first mentioned mold part by means of ejecting pins, and removes the excess material from the plunger by operating a knockout element.

The specification of the Berry patent recites:

"Many articles, such as dial faces for instruments, are provided with glass covers, usually slightly spherical, and are mounted in a surrounding frame or support. The machine of the present invention is designed to die-cast this frame or bezel of a plastic material such as cellulose acetate, one of the commercial varieties being 'Tenite,' and include in the casting the fragile insert so that upon the completion of the casting the frame or bezel will include the fragile insert permanently set in the bezel.

"Among the difficulties of this operation is the effecting of a closure for the mold cavity without breaking the fragile insert, and one of the purposes of the present invention is to accomplish this."

Two die-blocks, one fixed and one movable, are provided. Between them is an annular cavity into which the edge of the glass cover around which the plastic is to be molded is inserted. The fixed die-block has plates that are provided with pins for holding the glass cover. The movable die-block bears a closure ring slidably secured on screws and yieldably pressed forward by springs. The ring has a closure edge for engaging a sharp edge of a die-plate that is mounted in the fixed die-block. Means are provided for moving the movable die-block to and from the fixed die-block in timed relation to means provided for injecting the plastic material into the die cavity.

A more specific description was recited in the decision of the board as follows: "The Berry patent shows a device for molding a ring of a plastic material around the periphery of a concave-convex glass cover plate for an instrument such as a gauge or clock. In this patent there is only one workpiece, namely, the cover glass. A spring biased plate 86 has an annular rim that contacts one face of the cover glass a small distance inwardly of and concentric with the peripheral edge of the glass. This rim constitutes the inner wall of the mold space at one side of the workpiece and the end wall of the mold cavity on that side of the workpiece is formed by the die block in which the plate 86 slides. The inner wall of the cavity on the other side of the workpiece and the outer wall of the cavity are carried by a die block 4. The mold cavity of the Berry patent is filled with plastic material which is extruded through sprue holes in the die block 4."

The board then continued:

"It is the Examiner's position that the claims do not patentably distinguish from the structure resulting from the substitution of Berry's mold for the mold of the Shaw patent. We are not convinced by the arguments presented in appellant's brief and at the hearing that the Examiner's position is erroneous. The particular problem to which appellant's molding operation is directed is obviously not the same as that with which either Shaw

or Berry is concerned but the claims do not clearly and definitely bring out this difference. Appellant is concerned with forcing plastic material into an annular space between two concentrically disposed workpieces that may be of different axial length. While the claims refer to workpieces, they do not describe the character of the workpieces or their relative positions. In so far as claimed, the workpieces could be two flat plates with a horizontal space between them. Claim 4 states that the moldable material is forced into 'a space between the work pieces' while claims 9 and 10 say that the moldable material. is forced 'into engagement with the workpieces.' The latter expression does not even specify that the moldable material goes between the workpieces.

"As the Examiner points out, Berry could without invention apply his moldable material around more than one workpiece. The resilient mounting of Berry's plate 86 is such that the plate will accommodate itself to workpieces of different thicknesses and to a plurality of workpieces superimposed one upon another. The statement in claim 4 that the cylinder has a surface which cooperates with the platen 'for clamping work pieces therebetween against said surface in predetermined position' does not define any particular position of the workpieces nor does the recitation in claims 9 and 10 that the workpieces are 'clamped in alignment with said surface.' Aside from these functional limitations, the appealed claims would be substantially met in structure by the combination of Shaw and Berry proposed by the Examiner.

"We do not think that where the structure recited is substantially met in the references, these functional distinctions which neither clearly define appellant's problem nor its solution can serve to confer patentability upon the claims over the prior art."

It will be observed that while the board conceded that "the particular problem to which appellant's molding operation is directed is obviously not the same as that with which either Shaw or Berry is concerned," it may not be overlooked that it

added *"but the claims do not clearly and definitely bring out this difference"* (italics ours), and, as alleged in the brief of the Solicitor for the Patent Office, the lack of clear definition is delineated in the decision of the board.

We quote the following from that brief, which further elucidates the board's finding: "* * * Claim 4 states only that the work pieces are clamped against the bearing surface of the cylinder in predetermined position and that the moldable material is forced into a space between the work pieces. If appellant's arrangement is designed for the injection molding of plastic material into an annular space between two concentrically disposed workpieces that may be of different axial length, and the pieces are assembled in the device quickly and accurately, it is believed to be obvious that claim 4 does not bring out this concept and defines no structure which could inherently perform the functions or purposes alleged. For the same reasons, neither claim 9 nor claim 10 defines structure to accomplish that result."

We do not understand the board's conclusion as quoted, supra, necessarily to mean that in its opinion the claims would be allowable even if they did clearly and definitely bring out the difference between appellant's structure and the structure of the cited prior art, but assuming they would be, we think that unless the claims themselves clearly define differences in structure they may not be allowed. In other words, since the claims of the application constitute the measure of the protection sought, it is immaterial that the disclosure of the application might support claims differently phrased, and, further, if the appealed claims are phrased as the board held in effect, so that they are met substantially by the prior art cited, they are not patentable.

During a period of more than a century it has been stated again and again by all courts having jurisdiction in patent matters that it is proper to combine prior art disclosures of features pertinent to the claims of an application when considering the question of patentability. Authorities in support of this rule sufficient to fill

hundreds of pages might be cited. Our decisions in the cases of In re Farrand, 49 F.2d 1035, 18 C.C.P.A., Patents, 1452, and In re Fridolph, 134 F.2d 414, 30 C.C.P.A., Patents, 939, are deemed apropos in this case.

As has been indicated, the Shaw patent cited in the instant case was not cited as being of itself a complete anticipation of the structure described in the appealed claims. That patent, however, is in the same field of art as that of appellant's application. Each discloses an apparatus for molding plastic products, and the board's statements that (1) "the Shaw patent shows a molding apparatus generally similar to appellant's," and that (2) "the mold cavity [of the patent] is filled by extrusion in the same manner as in appellant's device," do not appear to be questioned by appellant.

The similarity of certain vital features of appellant's structure to certain vital features of the Shaw patent is pointed out in the brief of the Solicitor for the Patent Office as follows: "* * * appellant's platen 8 corresponds to Shaw's platen A; appellant's platen 25 carrying cylinder 28 corresponds to Shaw's arms K carrying cylinder Z; and appellant's piston 37 corresponds to Shaw's piston D."

The brief also states: "* * * Moreover, in operation the two devices also are essentially the same, for the reason that in each, upward movement of the lower platen toward the intermediate platen closes and forms the mold cavity; continued movement of both toward the plunger compresses the plastic material in the cylinder carried by the intermediate platen forcing it downwardly through the opening in the bottom of the cylinder to the mold cavity; and downward movement of the platen brings into play the ejecting pins carried by the lower platen to remove the molded article from the apparatus. Hence, it is believed to be clear and undisputed that the general combination and manner of operation of the Shaw apparatus and that of appellant are essentially the same."

It is thought that the Berry patent has been described sufficiently, supra.

The Primary Examiner said, inter alia: "* * * The Berry patent discloses the mold structure recited in these claims. * * * To mount Berry's mold in the Shaw platen press and provide it with a cylinder for holding material in the manner taught by Shaw is not seen to amount to invention. The Shaw press is a press commonly used in transfer molding and may be used interchangeably with the press and injection cylinder shown in the Berry patent. The recitation of the intended use of the device as for clamping work pieces and the like does not lend patentability to the claims. The Berry mold might obviously be used to enclose additional work pieces where desired. Yieldable pressure plate 86 of the Berry platen functions exactly in the same way as does applicant's yieldable plate. It supports an insert which may be of variable thickness so as to insure complete closure of the mold in each casting operation."

All the foregoing obviously is implicit in the somewhat differently phrased decision of the board hereinbefore quoted.

The gravamen of the contention on behalf of appellant before us seems to be that there are differences between his structure and a structure which would result from mounting the mold of the Berry patent in the frame of the Shaw patent which differences are sufficient to distinguish patentably from the references. The differences so claimed appear to relate primarily to the feature of joining two work pieces by a molding operation.

It appears to be true, as stated by the board, that the Berry patent discloses only one work piece, namely, the cover glass, but we find no reason for disagreement with the holding to the effect that the Berry mold might be used to enclose additional work pieces when desired, and we agree that nothing more than mechanical skill would be required to make any structural changes requisite to provide such use.

■ Furthermore, in this case the matter of patentability is not determinable from appellant's disclosure but depends primarily upon what he chose to claim.

■ We are not convinced that the decision of the board should be reversed upon the merits.

Appellant presents a reason of appeal upon which, because it relates to a question of practice, we deem it proper to pass.

After the decision of the Board of Appeals had been rendered on May 22, 1950, appellant engaged new counsel and through his new counsel two papers were filed concurrently in the Patent Office. Both were filed July 19, 1950, which was just one day before the time for taking appeal to this court expired.

One paper, addressed to the Commissioner of Patents, requested the entry of amendments to the claims on appeal "for the purpose of meeting the terms [of the board's adverse decision] thus overcoming the final rejection and placing the application in condition for allowance."

The other paper was entitled "Petition to Commissioner." In it the proposal to amend was recited and the commissioner was advised that the board was being requested "to make more explicit the statement of differences and to state that the claims may be allowed in amended form." It was asked also that in the event the board did not grant such request the commisssioner "direct the Primary Examiner * * * to reopen and reconsider the patentable merit" of the claims as amended.

The record does not show an entry of the proposed amendments, nor does it show any action by the Commissioner of Patents upon the petition to him, but it does show that on July 20, 1950, the day following the filing of the proposed amendments and the petition to the commissioner, notice of appeal to this court was given, the notice being signed by the new counsel.

The brief on behalf of appellant explains the course pursued as follows:

"The decision of the Board of Appeals recognized that appellant's molding operation is not the same as in the cited patents but stated the claims did not bring out this difference. Specifically the character of the work pieces and their relative positions were deemed not properly described.

"Accordingly after the Board's decision and the appointment of new counsel an attempt was made by petition (a) to have the Board make specific recommendations as to acceptable amendments to the claims or (b) to have the Primary Examiner directed to enter and favorably act on a proposed amendment drafted to present the claims in allowable form.

"Before the Commissioner acted, the time for filing notice of appeal to the Court arrived. On receipt of this notice the Patent Office decided that it had lost jurisdiction to act on the petition.²"

Appellant's sixth reason of appeal reads: "The Board erred in refusing to state explicitly that the said claims may be allowed, if amended as proposed by the amendment offered July 19, 1950."

And the brief on appellant's behalf asserts: "It is submitted that the power of the Court to revise the decision of the Board of Appeals is ample authority to include in its decision a consideration of the merits of the appealed claims when amended as proposed."

We do not think the board erred "in refusing to state explicitly that the said claims may be allowed, if amended as proposed by the amendment offered July 19, 1950."

■ There is no evidence that the proposed amendments to the claims were in fact ever seen by the board. No motion for reconsideration by the board of its decision affirming that of the examiner was presented. That would seem to have been a primary requisite for securing any action relative to the proposed amended claims. Furthermore no request for an extension of time within which to file a request for reconsideration was made.

■ It may not be held properly that a tribunal erred in not acting on claims which are not shown to have been before it at

2. The decision referred to must have been made orally and counsel informally advised of it. It does not appear in the record before us.

a time when action could be taken concerning it.

It is unnecessary to determine just what authority this court has respecting amendments to claims timely proposed and entered in the Patent Office but not acted upon by the Patent Office tribunals.

We feel certain that in the instant case where the amendments were not entered and never became a part of the case we are without jurisdiction to consider them. See In re Slate, 108 F.2d 268, 27 C.C.P.A., Patents, 810; In re Taylerson, 142 F.2d 72, 31 C.C.P.A., Patents, 1025; and In re Heritage, 153 F.2d 111, 33 C.C.P.A., Patents, 783.

The decision of the Board of Appeals is affirmed.

Affirmed.