**TIPPER TIE, Inc., et al., Plaintiffs,**

v.

**HERCULES FASTENERS, Inc., et al.,**
**Defendants.**

**Civ. A. No. 92–53.**

United States District Court
D. New Jersey.
April 20, 1955.

Peter J. Gaylor, Elizabeth, N. J., George B. Turton, Newark, N. J., for plaintiffs Tipper Tie, Inc. and Made-Rite Sausage Co. of California.

O'Connor, Morss & Mancini, Elizabeth, N. J., by Richard R. O'Connor, Elizabeth, N. J., for Hercules Fasteners, Inc.

Bauer & Seymour, New York City, by John L. Seymour, New York City, of counsel.

Joseph Harrison, Newark, N. J., for defendant Albert O. Steckman.

HARTSHORNE, District Judge.

Tipper Tie, Inc., a New Jersey corporation, sues for a declaratory judgment [1] as to the invalidity of the Frank and Macy patent [2] assigned to defendant Hercules Fasteners, Inc., a New Jersey corporation—Hercules. In turn, Hercules counterclaims against Tipper Tie, claiming that it infringed by the use of a process and product for the closure of sausage casings, covered by such patent owned by Hercules, hereafter called the Hercules patent. Made-Rite Sausage Company of California, consisting of several individuals trading as such, voluntarily was made plaintiff, as lessee of Tipper Tie's sausage-making machine. Steckman was later made plaintiff, on Hercules' motion, both Made-Rite and Steckman then being made defendants to Hercules' counterclaim.

1. 28 U.S.C.A., Judiciary, § 2201.

2. Frank and Macy Patent 2,493,063, filed March 4, 1946, issued January 3, 1950.

The issues as to the validity of the Hercules patent and its infringement by Tipper Tie, Made-Rite and Steckman are the prime patent issues, including the usual issues subordinate thereto, as well as a charge that Hercules made fraudulent representations to the Patent Office.

In addition to these patent issues the pleadings and pre-trial raise a series of other contentions, including that by Hercules that Steckman, as a former Hercules officer, and now Tipper Tie's President, had engaged in unfair competition against Hercules, Tipper Tie and Made-Rite being similarly charged with unfair competition and unclean hands. Plaintiffs in rebuttal thereto, and as to Hercules' infringement counterclaim, allege that Hercules is misusing its patent by tieing-into it an unpatentable fastener, contrary to the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note. Plaintiffs further deny that the unfair competition claim is so related to the patent issues that this Court has jurisdiction of same [3] in the absence of complete diversity of citizenship, as here, defendant Hercules, as well as plaintiff Tipper Tie and plaintiff Steckman, all being New Jersey corporate or individual citizens.

Since the entire case thus involves not only the usual patent issues, but a series of other issues, which in part at least, are dependent upon the determination of the patent issues, the Court suggested that the patent issues be tried first—infringement and then validity— but that the remaining issues be tried thereafter, in the light of the decision of the patent issues. Ultimately both parties agreed thereto, and this was accordingly done. The present opinion thus deals solely with the strictly patent issues, including the alleged fraudulent representations to the Patent Office by Hercules, the evidence as to which was included in full with that as to the patent issues.

## Findings of Fact

### Infringement

1. Plaintiff Tipper Tie is a New Jersey corporation. Plaintiff Steckman is a citizen of New Jersey. Plaintiff Made-Rite is a California partnership. Defendant Hercules is a New Jersey corporation.

2. The patent owned by Hercules "has particular relation to sausage casings and to means and methods of sealing the ends of sausage casings",[4] specifically by the use of metal fasteners of different, but similar, kinds, instead of by the previous method of tieing the casing by string.

3. Admittedly Tipper Tie uses the same method, for the same purpose, save that it claims to use a different metal fastener.

As revealed by the claims in the Hercules patent [5] it covers first the process

---

3. 28 U.S.C.A., Judiciary, § 1338(b).

4. Frank and Macy Patent 2,493,063, column 1, lines 4 to 6.

5. Above Frank and Macy patent claims are:

"1. The method of sealing a flexible casing that comprises pleating the collapsed end of the casing, passing a barrel fastener over the gathered pleats, and crimping the fastener into firm and sealing contact therewith."

"2. The method of sealing a flexible casing that comprises pleating the collapsed end of the casing, passing a flanged metal tube over the gathered pleats, and crimping the tube into firm and sealing contact therewith."

"3. The method of preparing a sausage casing that comprises pleating the end of the casing with longitudinal pleats, gathering the pleats together, passing a flanged metal barrel fastener over the pleats, and crimping the fastener upon the pleats with longitudinally aligned crimps."

"5. A sausage casing comprising a flexible, elongated, transparent, cellulosic casing having an end longitudinally pleated and sealed by a flanged metal barrel fastener having flat sides bearing against the flat sides of the pleat and having crimps, the outer rim of the fastener being snug against the tube substantially throughout its circumference, and the flange of the fastener serving to protect

of sealing sausage casings (Claims 1, 2, 3), and also the product of that process (Claims 5, 6, 7, 8). This process involves the pleating, of the ordinary sausage casing, passing a flanged metal barrel fastener or tube over the pleats, and then crimping the fastener, so as to seal the casing permanently. All of these steps of course are taken, at one end of the sausage, before the casing is filled with the sausage. Separately considered, each of the individual elements in this process were previously well known to the art. Hercules' primary claim is that the combination of these known elements by that method was novel, achieved a novel result, and that Tipper Tie's process used the same elements, for the same purpose, to achieve the same result. With the exception of the fastener itself, Tipper Tie admits all this. In fact, Tipper Tie proved, by its own witness, Maynard Tipper, that the inception of the Tipper Tie method was Tipper's endeavor to make an improvement on the Hercules patented process and product.

4. If Tipper Tie's fastener is not in fact the same as some of those covered by the Hercules patent, it is so closely similar to a Hercules fastener, that it constitutes its equivalent.

The principal purpose of any fastener of a sausage casing is to exert such pressure on the pleated casing as to seal it, and prevent the escape of the sausage while it is being smoked, and before it is eaten. It would appear that, as compared with a string-tie fastener, any metal fastener which is practical is more sightly, more sanitary, and probably a bit more speedy, than the string tie method.[6] This applies, regardless of whether one uses in this identic process, the fastener used by Tipper Tie or those used by Hercules.

The Tipper Tie fastener is one of the almost innumerable kinds of metal eyelets known to the trade, specifically a closed-end eyelet, i. e., one closed at one end with a flange at the other end. In addition, it is not round, but has flat sides, the latter simplifying its crimping against the pleated casing, after the casing's insertion into the eyelet.

Turning to the Hercules fastener, we note it is described in most of the Hercules patent claims as a "barrel fastener". However, in Claim 2 it is described as a "flanged metal tube", and in Claim 5 it is described as a "flanged metal barrel fastener having flat sides". Moreover, in the Hercules patent drawings, figure 4 shows an oblong fastener having flat sides, just as has Tipper Tie, though without a cap, and figure 12 of the Hercules patent shows a fastener with a cap, the cap being similar to, though not identic with, Tipper Tie's. Moreover, the specifications of the Hercules patent speak of this oblong flat-sided fastener as a "barrel fastener", specifically stating that "the fastener is of oblong shape". Further, such specifications, referring to figure 12, say that fasteners

the material of the casing against cutting by the metal."

"6. A sausage casing comprising a flexible, elongated casing having an end longitudinally pleated and sealed by a flanged metal barrel fastener having crimps bearing against the sides of the pleat, the outer rim of the fastener being snug against the casing substantially throughout its circumference."

"7. A casing comprising a flexible tubular pellicle having a pleated end sealed by a metal barrel fastener snug against the tube substantially throughout its circumference, and a flared annulus arranged in position to protect the pellicle from damage by the fastener barrel."

"8. A sausage comprising a casing having a pleated end sealed by a flanged metal barrel fastener."

Claim 4 is disclaimed by Hercules.

6. Particularly is this true if the entire process of applying the metal fastener to the casing as above is automatically done by a single machine, such as Tipper Tie, and not Hercules, uses. But this machine, on which Tipper Tie has recently obtained a patent as a machine, is outside the issues in this case, since this last patent covers the machine as such, and not the process of the use of metal fasteners to seal sausage pleated casings— the basic principle here involved.

"may be closed at the outer end as shown in that figure."

Thus, whether or not we consider an oblong fastener with flat sides and closed at the outer end, such as that used by Tipper Tie, to be a barrel fastener, as Hercules' witnesses testified that it was considered in the trade, and as it is apparently defined to be in the Hercules patent, it certainly is a "metal tube" covered by Hercules' Claim 2. Further, at the trial the Court had before it not only the Tipper Tie fastener, flat-sided and capped at one end, before it was applied, but a Hercules fastener which plaintiff admitted was a barrel fastener, to wit, one open at both ends and round, without flat sides. Thereafter this Tipper Tie fastener and this Hercules fastener were applied by crimping to the opposite ends of a sausage casing, marked in evidence as Exhibit D 13. The fact that the sausage casing protrudes slightly through the outer end of the Hercules fastener, whereas the closed top of the Tipper Tie fastener prevents this, would seem for all practical purposes to be quite immaterial. Outside of this, these fasteners, when so applied to the sausage casing, and flattened by crimping, present essentially the same appearance and achieve substantially the same result. Obviously, they are therefore equivalents, if they are not in fact duplicates.

## Conclusions of Law

(a) This Court has jurisdiction of this cause, at least in its patent aspects.

██ (b) Since Tipper Tie uses the same elements as does Hercules, or their equivalents, in the same way, to perform the same function and accomplish substantially the same result as does Hercules, it infringes the patent owned by Hercules, assuming the latter to be valid. When elements perform the same function, in substantially the same way, they are equivalents. Walker, Patents, Dellers Ed., Vol. 3, Sec. 468, and cases there cited.

██ "His patent covers equivalents as fully and effectively as it does the invention. Thus, where the alterations are formal but are adapted to perform the same functions, in substantially the same manner, the patentee is guaranteed the exclusive right to their enjoyment for his sole benefit, and, if any one assumes to utilize such alterations in combination with the patentee's combination, he becomes an infringer as certainly as if he had adopted the entire patented device." Maunula v. Sunell, C.C.Or., 1907, 155 F. 535, 540.

" * * * if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same * * *." Willis v. Town, 8 Cir., 1950, 182 F.2d 892,[7] 893.

## Validity

### Findings of Fact

██ In brief, the findings and principles applicable as above, as showing that Tipper Tie infringes the patent owned by Hercules, also apply and demonstrate—inversely—that the Hercules patent is invalid, as anticipated by the Young patents,[8] both prior in time to that of Hercules.

5. The basic purpose and use of the prior Young patents, on the one hand,

7. Sherwin-Williams Co. v. Zachos, D.C. N.D.Ga.1947, 70 F.Supp. 986; Cleveland, etc. Works v. E. W. Bliss Co., 6 Cir., 1944, 145 F.2d 991. Celluloid Corp. v. Libbey-Owens Ford Glass Co., D.C.N.D. Ohio 1941, 40 F.Supp. 840. Love Tractor v. Continental Farm Equipment Co., D.C.Neb.1951, 91 F.Supp. 193.

8. The first Young patent 2,307,181, casing closure, filed November 15, 1939, issued January 5, 1943. The second Young patent 2,460,963, casing closure, filed September 29, 1943, issued February 8, 1949. It will be noted that the first Young patent was both filed and issued, and the second Young patent was filed, before the filing of the Frank and Macy patent, owned by Hercules. Counsel agree that previous filing, irrespective of actual issue, gives legal priority, in the absence of differentiating factors, here inapplicable. Thus both Young patents are prior to that owned by Hercules.

and of the Hercules patent, on the other, is the same.

As shown above, the basic purpose of the Hercules patent was to use a metal fastener for "sealing the ends of sausage casings" in lieu of the unsatisfactory string-tie method. In both the Young patents, after alluding to the unsatisfactory string-tie method "to prevent leakage" from sausage or other closures, both Young patents, in identic language, state, as their first object, that of incorporating a "mechanical clamping factor in the gathered closure of the casing which will assure the tightness of the same permanently."

6. To accomplish this purpose and use, both Hercules and Young use elements, all of which are old.

It was admitted at the argument on behalf of both Hercules and Tipper Tie that the sausage casing was previously well known in the art, that the pleating of the casing was so known, that a barrel fastener with a flange, or its equivalent, a metal tube fastener, was so known, that crimping of metal itself was so known, and that the process of sealing a casing generally was so known. Hercules' claim is that the combination of these elements, in order to seal a casing, whether for sausage or cosmetics, is unknown. Hercules thus claims a combination patent. To this situation Hercules asks that the rule be applied that, even where old elements are used, if their combination results in a new function or use—a non-analogous use—the combination is patentable.[9]

7. However, the function or use sought by Hercules is not new. It is the same as that sought by Young, and it is achieved in essentially the same way as in the previous Young patents.

When analyzed, the essence of the Hercules patent is a sealing of the casing, accomplished by pressure from a metal fastener on the pleated casing, which permanently prevents leakage of the contents through the casing pleats. That basic idea and purpose is identic in both the Young patents and the Hercules patent. In other words, its essence is the placing of permanent sealing pressure on the casing pleats by a metal fastener.

In order to do this Hercules normally uses a metal barrel fastener,[10] i. e., a round fastener with a flange at the bottom.

Turning to Young, we note that practically all of Hercules' argument as to lack of anticipation by the Young patents, is directed to the attempt to differentiate his patent from the second Young patent, not from the first Young patent. But Young's first patent, as well as his second, is important, as showing anticipation. It has already been noted that the function or use of both Young patents was essentially the same as that of Hercules, i. e., the sealing of a pleated sausage casing by applying pressure, through a metal fastener, on the casing pleats. Furthermore, well before Hercules, Young used the same well-known elements, or their clear equivalents, to achieve this same function, use or purpose. He used the same sausage casing. He gathered the casing in "accordion folds", i. e., pleats. To these he applied a metal fastener, this fastener being of the same general shape as the Hercules barrel fastener, save that it did not completely encircle the pleats, and had no bottom flange, of which more later. This metal fastener, which operated in an equivalent manner to that of Hercules, Young then "clamped" mechanically down on the casing by "hand tools or machines", this clamping itself being the equivalent of the Hercules crimping.

9. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Co., 1950, 340 U.S. 147, 151, 71 S.Ct. 127, 95 L.Ed. 162; Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 1938, 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008; 35 U.S.C. § 100(b).

10. We here disregard, as pertinent only to Tipper Tie, not to Young, Hercules' alternative use of an oblong fastener capped at one end, as covered by its patent.

Hercules claims that while generally the methods are the same and so is the purpose, as well as most of the above elements, the distinctions above alluded to prevent the elements from being equivalents. But that viewpoint is entirely too narrow from the standpoint of either the art or the basic constitutional theory of invention. Clearly these insignificant differences, in these old elements, every one of which has long been known to the art, are so slight in both their nature and their effect that Hercules has, in its patent, not really added anything to the fund of human knowledge. For whether the casing pleats are fully surrounded by the metal fastener, or surrounded 80% or 90%, their purpose and their effect of exerting sealing pressure on the pleats are exactly the same. Indeed, not a word has been pointed out in the first Young patent, to show why the wings of its metal fastener which form the collar could not be so made as to encircle the pleats completely, exactly as does that of Hercules. And of course the patent covers, as it expressly states "minor changes and refinements", such as the possible slight extension of such wings to meet each other. Nor does the lack of a flange in Young's first patent create any lack of anticipation. For the use of a flange for similar purposes is well-known to the art. And anyway such a flange is used on the metal fastener for sausage casings in the second Young patent, which also is prior to Hercules.

Nor is there any real difference between the crimping claimed in Hercules and the clamping used in Young. The purpose of both is the same, i. e., to bend the metal fastener tight against the casing pleats, so that it will maintain constant pressure against the pleats, and thus seal the casing. The clamping is to be done by "simple hand tools or machines", as stated in the first Young patent. These "hand tools or machines", whether they be pliers or other means, may have a smooth face or they may have "serrations" on their face, as Young testified his had. The latter would undoubtedly give a crimping in its most technical aspect, i. e., the "bending of metal", and in an undulatory fashion. As Young testified: "We did crimp the metal by squeezing it." But the clamping of the metal, even with plain-faced pliers, gives the metal a bending, which in turn clamps the pleatings of the casing, and seals it in essentially the same way and with the same result, as does Hercules' crimping.

Young has an additional advantage over Hercules in preventing the slipping of its fastener, not only by its clamping, but by the turned-up tongue of Young (figure 4, item 21) which fits under the down bend of the pleated folds of the casing (figure 3, item 17, and figure 4). But this additional advantage of Young, since it is supplemental to the use by both Young and Hercules, of the same old elements or their close equivalents, in the same way, and to achieve the same result, does not affect the fact that, so far as Hercules went, it is essentially the same as Young. "The greater includes the less."

8. The slight differences in Hercules from Young are not inventive, but were both well-known to those skilled in the art.

These differences are confined to Hercules' completely round fastener and its flange, and to the crimping of the fastener. But any artisan skilled in the art, and furnished with an 80% collar, would certainly be apt to think of a complete collar, since numerous kinds of these had long been on the market. Similarly any number of these complete collars, or eyelets, had long been marketed with flanges. Further, the crimping of metal to maintain its pressure had long been known to the metal arts, and, even if clamping does not cover crimping, with a clamped metal eyelet before him any artisan familiar with eyelets would consider crimping it to be a simple alternative.

9. The presumption as to the validity of the Hercules patent is much weakened by the facts in this case.

The Hercules patent itself does not recite either of the Young patents. On its face, therefore, the Patent Office did not

consider the Young patents, when it granted the patent to Frank and Macy, Hercules' assignors. Doubtless this was due in part to the fact that (1) the Young patents came from a different division in the Patent Office—buttons, buckles and clasps—than did the patent owned by Hercules, which came from the food division. The Young patents were thus more likely to have been overlooked by the Patent Examiner himself than if they had come from the same division. Nor (2) were the Young patents cited to the Patent Office by Frank and Macy, on their first application. Not until after the Examiner had determined that the patent should be granted Frank and Macy, did they or their attorney even mention the Young patents. When he did so, he did so casually in a letter, giving no patent number, the reference itself being inserted in the midst of a series of references to other patents, all of which others it was known that the Patent Office had previously considered. Furthermore, this was done in connection with an application for a further claim, which the Patent Examiner and the Commissioner refused to entertain, i. e., practically refused to consider at all. Thus this belated, indefinite allusion to "Young" was probably given no real consideration whatever by the Patent Office.

While this Court does not feel justified in holding that these facts alone show fraud on the Patent Office by Hercules' assignor, they do indicate that such patent applicants neglected to take the usual and effective method of calling the Young patent, then issued, to the attention of the Patent Office, before the Hercules patent was issued to Frank and Macy. This neglect renders the presumption of validity of the Hercules patent, arising from its grant, weak, indeed.

10. Nor has Hercules established real commercial success.

■ If the chart in evidence proves anything, it simply shows that certain previous customers of Hercules bought smaller quantities from Hercules after Tipper Tie came into the market, i. e., it proves not the commercial success of Hercules, but perchance that of Tipper Tie, already adjudged an infringer of Hercules, if such patent is valid. Indeed, if we compare the number of potential customers of Hercules in the trade with the number of its total actual customers, we find Hercules had sold but 5% of the market. Finally, commercial success does not establish patentability. It is but a makeweight in case of doubt.[11]

11. Regardless of the operability of the second Young patent, the first Young patent is operable.

Hercules claims, as affecting the validity of the Young patents, and consequently their use as anticipations of his patent, that the Young patents are inoperable. But during the trial Hercules leveled its attack in this regard practically exclusively on the second Young patent, not against the first patent. True, this Court, on Hercules' motion, refused to admit into evidence the samples of sausage casing closures allegedly made in accordance with the second Young patent. But this was not because the patent was shown to be inoperable, but because (1) such samples were not shown to have been made according to standards insisted on as fair by Hercules, and (2), because in the handling of one of these samples by the witness, by the Court, and then by Hercules' counsel, and with real pressure, the fastener itself broke and then came off. Under such circumstances, the Court stated it was not satisfied that the operability of the second Young patent had then been proved to its satisfaction. Indeed, at that time, after striking out the samples, there was no evidence of operability of the second Young patent, save for the presumption of operability which arose from the granting of the patent itself.

However, thereafter, the patentee, Irving L. Young, was flown in, on short notice, from Chicago, and took the stand.

11. Jungerson v. Ostby & Barton Co., 1949, 335 U.S. 560, 567-568, 69 S.Ct. 269, 93 L.Ed. 235.

While he admitted there were some failures in his second patent, he insisted that generally it had succeeded and that it was "very practical".

Then, in referring to his first patent, he testified that with its use, the casing was sealed, so that it held water, let alone sausage meat. When on cross examination, which was shrewd, to say the least, Hercules sought to show that Young's failure to market these patents generally proved their inoperability, an unusual situation developed, which disproved any such inference. Young, a robust and vigorous man of many business interests, in several mid-Western states, admitted that his main interest was not business, but religion. That accordingly he used the proceeds of these business interests primarily for his religious purposes. To do so he had formed a Foundation, with which he had erected a hospital and other charitable enterprises in the French Cameroons, where he had spent several years, after he had obtained the above patents, as well as several others along different lines. Furthermore, he called attention to the fact that his first above patent had been issued during World War II, and that his second patent had been filed at almost the same time. Thus, from patriotic motives, he had stopped all these private business interests, including the development and marketing of these patents, and turned over his plants to war work. Then, following the war, he had devoted his primary attention first to the above activities in the French Cameroons, where he had gone for a long period, and then to his other business interests, which he considered more important. He further testified that for some time he had had engineers trying to improve the casing closure patents in question, not so much, however, to improve the method of fastening itself, as to make the use of that method really practical, by making it a machine product rather than a handmade product. That he gave as the reason why his fasteners were flat pieces of metal before they were bent into collars or otherwise, i. e., so that they could be stamped out in quantity by machines from a flat metal strip. In short, he thought that the best thing he could do for the sausage industry, and thus in the end for his primary interest—religion—was not to improve his fastener and casing closure itself, with which he was apparently satisfied, nor to market them now when produced by hand, but to change the method of making these fasteners and their application to casings, so that the entire process could be done wholesale by machine, rather than piecemeal by hand—the very kind of operation for which Tipper Tie now has obtained its machine patent, which is not the subject of attack in the present suit.

In answer to all this, Hercules introduced no evidence whatever as to the inoperability of the Young patents. Bearing in mind that the grant of the patent itself carries with it a presumption of operability, the Young patents must be considered operable, and so, additionally, as an anticipation of the Hercules patent.

12. The patent owned by Hercules is fatally over-extensive in its claims.

As seen above, and as noted in footnote No. 5, Hercules makes a series of extensive process claims and a series of extensive product claims. These claims seek to cover a combination patent—here one using a series of old elements, and not in a new way, or to achieve a new purpose. For, not only are the elements old, but, as seen above, the combination of these elements is old, not new, being anticipated by the Young patents, and the purpose is old, not new, as anticipated by the Young patents. The only thing new at all in Hercules, is the possible slight difference in the fastener itself and the possible slight difference from clamping in crimping the fastener, as compared with Young. Further, these differences are themselves far from sufficient to be patentable, as shown above. But in any event, were this fastener and this crimping of inventive character, they would not authorize the issuance of a combination patent for the complete process or the complete product, as

claimed in the Hercules patent, but only the fastener and its crimping, at best, would be patentable, in light of Young's anticipation of the process and product generally.

### Conclusions of Law

(c) The patent owned by Hercules is invalid as anticipated by the Young patents.

The only difference between the process and product of Hercules and those of Young lie in the fastener and its crimping as distinguished, if possible, from its clamping. The Young and the Hercules fasteners are clearly equivalents. So are the clamping and crimping of such fasteners by Young and Hercules respectively. They perform the same function in substantially the same way, i. e., by the same combination. Hercules does not "add to the sum of useful knowledge", and so is not patentable. Great A & P Co. v. Supermarket Equipment Co., 1950, 340 U.S. 147, 71 S.Ct. 127, 130, 95 L.Ed. 162. Hercules, as a combination patent, must be scrutinized "with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements". Pennsylvania Crusher Co. v. Bethlehem Steel Co., 3 Cir., 1951, 193 F.2d 445, 448, 450.[12]

The limited character of the claims in the Young patents do not destroy their effect as anticipation of the Hercules patent.[13] True, claims, if ambiguous, can be explained by, and read in connection with, the specifications and drawings, but they can not be enlarged by the specifications, so as to give the patentee making the claims a broader patent than his claim gives him when so read. Montgomery Ward & Co. v. Coe, 1943, 78 U.S. App.D.C. 224, 139 F.2d 17. Parker Appliance Co. v. Irvin W. Masters, Inc., D. C.S.D.Cal.1950, 94 F.Supp. 72, affirmed,

9 Cir., 1951, 193 F.2d 180. In re Jurgeleit, 1952, 194 F.2d 120, 39 C.C.P.A., Patents, 794. Thus Young himself, as the patentee, can not claim more than his own claims state—practically the use of a metal fastener to seal a casing. Indeed, his claim in his first patent is only as to the fastener itself. In any event, these claims are much more narrow than those of the Hercules patent, which cover both the process as a whole and the product as a whole.

However, while Young can not insist that his patent covers the process as a whole and the product as a whole, Tipper Tie can claim that the Hercules patent is anticipated by the Young patents, and in that regard rely upon the disclosure in the Young patents, solely through its specifications and drawings of the process and the product, and irrespective of the claims of the Young patents. This is because this disclosure in the Young patents shows that Frank and Macy, the original patentees of Hercules, were not in fact the inventors of such process and product. "A person shall be entitled to a patent unless * * * (e) the invention was *described* in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent" (Italics the Court's.)[14] This, in fact, is but a codification of the rule previously laid down in Alexander Milburn Co. v. Davis-Bournonville Co., 1925, 270 U.S. 390, 400, 46 S.Ct. 324, 70 L.Ed. 651.

(d) Any possible improvements by Hercules on Young are not inventive, but simply the application of equivalent elements well known to those skilled in the art, by methods well known to those skilled in the art.

(e) The Hercules patent obtains but minimal support from its grant.

---

12. See also the decisions, all relied on by Hercules, quoted in the text under Infringement, Conclusion of Law (b) and those listed in footnote No. 7.

13. Indeed, as noted above, such limited claims might seem preferable, even by

Young, who anticipated Hercules, in the light of the previously known methods of sealing sausage casings.

14. 1952 Patent Act, Title 35, U.S.C. Patents, § 102.

(f) The Hercules claims are invalid as too broad.

Hercules asserts it has "improved" two elements—the fastener and its crimping —in an old process. It has then repatented the entire old process and its entire product. This can not be done. Thomas & Betts Co. v. Steel City Electric Co., 3 Cir., 1941, 122 F.2d 304. Only the above novelty, if any, is the proper subject of the patent.

Since the patent owned by Hercules is invalid, the use of its process and product by others is not unlawful under the patent laws. Whether such use is unlawful as unfair competition, as claimed by Hercules, and if so, who is responsible therefor, are issues to be hereafter determined.

An order may be entered accordingly.