**LOUIS A. GRANT, INC.**

v.

**KEIBLER INDUSTRIES, INC.**

**No. 70 H 19.**

United States District Court,
N. D. Indiana,
Hammond Division.

Oct. 18, 1973.

O'Connor & Weigle, Hammond, Ind., Frederick B. Ziesenheim, Paul A. Beck, Pittsburgh, Pa., George E. Fowkes, Oakmont, Pa., for plaintiff.

Albert C. Hand, Hammond, Ind., Robert J. Key, New Kensington, Pa., Richard E. Alexander, David D. Kaufman, Roy E. Petherbridge, Chicago, Ill., for defendant.

BEAMER, Chief Judge.

This cause came on for trial by the Court, and the Court, having heard the evidence and the arguments and having studied the briefs of counsel, now enters the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. In this action under 35 U.S.C. §§ 271 and 281, plaintiff seeks injunctive relief and an accounting for alleged infringement of two apparatus patents describing machines designed primarily for removing slag from soaking pits in the steel industry. Louis A. Grant, Inc. [Grant] is a Pennsylvania corporation with offices near Pittsburgh, Pennsylvania. Keibler Industries, Inc. [Keibler] is a Pennsylvania corporation having places of business near Pittsburgh, Pennsylvania, and within this judicial district. Grant and Keibler are both in the business of cleaning soaking pits and build their own machines for that purpose.

2. The issues presented are infringement and validity of the two patents and whether fraud was perpetrated on the

Patent Office in the procurement of the patents.[1] Plaintiff alleges infringement of claims 1–4, 7 and 8 of Grant, et al., patent 3,471,888 [the '888 patent] and claims 1–3, 5–9 and 12 of the Grant patent 3,458,396 [the '396 patent]. Plaintiff has stipulated that the asserted claims stand on representative claims 1, 3 and 4 of the '888 patent and claims 1–3 and 12 of the '396 patent.

*Background*

3. A typical soaking pit is a chamber approximately 24 feet long, 10 feet wide and 16½ feet deep with a sliding door on coping rails covering the pit. Natural gas is ignited in the pit, and waste gases are exhausted through recuperator ports at the bottom of the pit. The soaking pit equalizes the temperature of hot ingots after they are removed from the mold, and difficulties in the rolling and slabbing mills are thus avoided. The ingots oxidize and develop slag in the pits which sinters to a hard mass on the bottom of the pits, blocks the recuperator holes and must be removed. The traditional removal method was with manually operated jack-hammers; the pits had to cool for approximately 40 hours before men could enter, and even then the walls radiated temperatures as high as 180°.

4. Since steel production is directly related to the availability of soaking pits and because manual removal was time-consuming as well as extremely harsh work, many devices were tried as alternatives to manual cleaning. Among the methods attempted were dynamiting, punching holes or dropping ingots with a crane, and use of various types of machines. The Grant patents are directed to machines used for cleaning these pits.

*History of the Inventions*

5. Prior to 1964, Grant had designed machines for use in cleaning soaking pits and other equipment. In late 1964 Grant contacted Design Consultants for the purpose of redesigning existing Grant equipment. During meetings on or about January 22, 1965, the original conception of the suspended soaking pit machine disclosed in the '888 patent was made by Louis A. Grant and William H. Bickerstaff, an engineer with Design Consultants. Shortly thereafter, drawings were made and Grant fabricated the machine. It was reduced to practice at U. S. Steel Works in Homestead, Pennsylvania, on April 2, 1965. The '888 patent was filed January 3, 1966, by Louis A. Grant and Bickerstaff and issued on October 14, 1969, to plaintiff as assignee.

6. Shortly after the machine was used at Homestead Works, Bickerstaff wrote a report in letter form to Vincent Coliani, a nephew and assistant to Louis A. Grant. The report embodied comments on the existing '888 machine and ideas for improvement; some of these general ideas were incorporated in the '396 patent. The '396 patent was filed by Louis A. Grant on September 22, 1966, and issued on July 29, 1969, to the plaintiff as assignee.

*Subject Matter of the '888 Patent*

7. The machine disclosed in the '888 patent is "a demolition tool carrier and manipulator assembly for removing hardened material from the floor and wall surfaces of a soaking pit furnace *and the like.*"

The patent defines a combination comprising

(1) a rigid support structure;

(2) means mounted on opposite sides of the support structure for engaging external support means;

(3) a turntable rotatably mounted directly on the support structure at a position intermediate the sides;

(4) means for rotating the turntable;

(5) an extensible boom assembly with one end pivotally connected centrally to the undersurface of the turntable;

---

[1]. The issues of willful infringement and damages were reserved at trial for determination in a separate accounting proceeding if plaintiff prevailed on the primary issues.

(6) means for extending and retracting the boom assembly;

(7) means for pivoting the boom assembly coupled to the assembly and to the undersurface of the turntable;

(8) a demolition tool pivotally connected to the outer end of the boom assembly;

(9) means for pivoting the tool relative to the assembly; and

(10) means for actuating the tool when engaged with hardened material;

which, result in a configuration "whereby said boom assembly and said tool can be positioned vertically and operated directly beneath said turntable for demolition and prying operations."

8. The specifications indicate that the structure disclosed for element (2) includes a pair of opposed C clamps shaped to fit closely around the outer surface of the supporting beams and interfitting bolt and sleeve members. Element (4) is a motor and gear reduction unit. The boom is pivoted by a piston and cylinder arrangement, as is the tool holder, and the boom is extended by the same method. Claims 2–4, 7, and 8 are dependent claims which include the limitations of claim 1. Representative claim 3 claims a two-stage boom with the lower stage mounted on first, and a piston and cylinder connecting the boom assembly and the turntable which is closely adjacent the pivot point of the boom to permit vertical positioning. Representative claim 4 defines the turntable as being "rotatably mounted on the underside of said support structure" with the boom assembly "depended therefrom."

*Subject Matter of the '396 Patent*

9. The '396 patent is an improvement of the '888 patent. Claim 1 of the '396 patent describes a demolition machine with

(1) a supporting framework;

(2) a pair of outrigger assemblies;

(3) "means extendibly mounting" the assemblies on opposite sides of the framework for longitudinally extending them;

(4) a clamping mechanism mounted on each of the outriggers "for movement therewith" for clamping an external support between the clamping mechanism and the assembly; and

(5) means for "movably mounting" a tool supporting member on the framework.

Claims 2, 3 and 12 are dependent claims. Claim 2 defines the clamps as including a piston and cylinder arrangement with a clamping member on the outer end of the piston rod. Claim 3 details the framework as including parallel beams and outriggers which slidably mount to one another. Claim 12 includes the detail combinations of claims 7 and 8 and defines the hydraulic controls for actuating the movable structural elements. Specifically, claim 12 provides for fluid-actuated cylinders for activating the boom assembly and tool cradle with conduit connections coupled to a fluid swivel coupling mounted adjacent the turntable, an actuating fluid reservoir and motor pump unit mounted on the framework and fluid activated drive means for the turntable on the platform. It provides for a remotely operable valve stack with flexible conduit connection to the swivel coupling, drive means and cylinders for remote operation and a flexible conduit connection between the reservoir and the valve stack for supplying actuating fluid. The clamping mechanisms include a fluid actuated cylinder; there is a fluid actuated demolition tool.

*Invention*

10. In his letter Bickerstaff suggested resting machine rails directly on the pit rails with means to extend the machine rails. There was no evidence that Bickerstaff reduced these improvement ideas to practice. Although plaintiff's interpretation of the Bickerstaff letter as a consensus of ideas is untenable in light of the specific language of the document, the letter indicates that the suggestions were merely general proposals

and not definite and permanent ideas of the complete '396 device which could be reduced to practice without further skill in devising the specific means to make the ideas operative.

11. In the fall of 1964, Mr. Skendrovic conducted negotiations with Grant for the formation of a joint company. His testimony revealed a complete lack of credibility, and the evidence will not support a finding that he disclosed to Grant various sketches of suspended soaking pit machines having the combination of elements of the '888 patent before the negotiations ended in November 1964.

12. Grant's machine incorporating the disclosures of his two patents received great commercial success. Richard C. Keibler, president of defendant corporation, was employed by Grant from February 1965 to February 1967. When he left Grant's employ, Keibler fabricated his own suspended soaking pit machine and entered into competition with Grant. His machines also met with swift and outstanding commercial success, and the Grant and Keibler machines are now the only machines used in the steel industry for cleaning soaking pits.

*Infringement of the '888 Patent*

13. Except for minor improvements, the Keibler devices respond precisely to the claims in issue with one exception. The differences which Keibler considered improvements, but which do not prevent his device from responding to the claims of the patents, consist of a spring behind the hammer, increased arc of the tool holder, a turntable flush to the deck of the support structure, "low profile" of the boom, a gear reduction unit instead of a chain, an oil cooling mechanism, a hydraulic hose reel, rollers on the clamps, and a three-stage boom rather than a two-stage boom.

14. The exception to literal infringement, and the only difference relied upon by defendant in its brief, is that the boom assemblies of defendant's machines cannot be positioned at a completely vertical angle, but are limited to a rotation of approximately 175°. The machines were purposely constructed with this limitation, because Keibler considered the vertical position a difficult working position and also wanted a construction enabling the boom and tool to be moved out of the pit for changing the tool. Structurally, his machines have stops which prevent the boom from being positioned vertically. The tool itself can be operated directly beneath the turntable by pivoting the tool under the boom, although this would be a poor working position. A difference in the position of the trunnion also contributes to prevention of vertical positioning; the connection for the piston and cylinder arrangement between the boom and the turntable is set back from the pivot connection between the turntable and the boom.

15. During the course of the prosecution of the '888 patent application, the application claim 18, which became claim 1 of the '888 patent, was amended to include the "whereby clause" in response to a rejection by the patent examiner based on prior art. In the "Remarks" section of the amendment, plaintiff's solicitor stated that the machines in the prior art had boom assemblies and tools, but that the prior art machines were not capable of operating the boom and tool directly beneath the turntable for both demolition and prying operation.

*Infringement of the '396 Patent*

16. The Keibler Type I machine has extendible outriggers with clamping mechanisms mounted on the outriggers for clamping the machine to an external support and hold the machine down against reacting to the force of the tool. The structure of the Keibler Type I machine falls precisely within the claims of patent '396 which are in issue. Plaintiff does not assert infringement of patent '396 by Keibler's Type II machine.

*Validity—Obviousness*

17. 35 U.S.C.A. § 103 provides

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains . . .

As observed in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1965):

"While the ultimate question of patent validity is one of law, . . . the § 103 condition, . . . lends *itself to several basic factual inquiries.* Under section 103, the scope and content of the prior art are to be determined, differences between the prior art and the claims at issue are to be ascertained and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or unobviousness of the *subject matter is determined.*"

Secondary considerations which give light to the origin of the subject matter are commercial success, long felt but unsolved need and the failures of others.

*Scope of the Prior Art*

18. The claims of both patents in suit are directed to a combination of elements. Each of the elements of the claims of both patents existed in the prior art in a great number of references, and the corresponding structures detailed in the specifications for performing the desired functions are all well known mechanical elements. Of course, the mere showing that the elements of the claims can be found at scattered places in the prior art does not negate invention, which can exist in a new combination of those elements to produce a new and surprising result or an old result in a more economical and efficient way in a particular environment which presents unusual or difficult problems. Thus, plaintiff argues that the evidence proved that the claims of the '888 patent resulted in a new combination of elements to solve a long-standing problem of remotely cleaning soaking pits, and that the combination, unlike those in the prior art, provided a unique capacity for vertical positioning of a boom assembly and demolition tool for demolition and prying operations. Plaintiff further argues that the claims of the '396 patent constituted a unique combination of elements to solve the problem of adjusting such a machine to the soaking pits of various sizes. These distinctions will be considered in conjunction with the specific content of the prior art and the differences between that art and the plaintiff's patent claims.

19. The Grant 3,302,976 is a device for delining a blast furnace. It claims a platform with a carriage rotatably mounted on the underside with pivotally mounted telescoping boom assemblies having pivotable demolition tool assemblies connected to them. The pivot mountings are "disposed to permit angular and vertical displacement" of the boom assemblies. Piston and cylinder arrangements are claimed "to engage forcibly the inner surface of the furnace" to stabilize the structure, and there are means claimed for actuating the elements. The examiner found that it would be obvious to mount the '976 device directly to a travelling carriage structure, to mount the device on a trolly and to clamp the device to rail members, and that the location of the pivot connections was obvious in light of Grant '976. He relied on the Kinney and Russian patents for the finding of obviousness. The Russian patent 135,-224 reveals a demolition device with a movable carriage on rails which is pivotable. The Kinney, et al. patent 2,406,546 shows a ramming device for punching frozen coal in coal cars which has a support structure on rails with a pivotable boom and keeper devices which

function as clamps. As the examiner apparently recognized by his original rejection of the claims, these prior art devices disclose the combination of elements which make up the patent claims and indicate that the '888 patent disclosed no significant improvement over the '976 claims in light of the prior art.[2] Though the examiner eventually allowed the claims after the addition of the "whereby clause", that addition was a purely functional claim which added nothing to the structure of the '888 patent. However, even if the "whereby clause" is not considered purely functional, analysis under § 103, without consideration of the '976 device, indicates that the '888 claims were insignificant deviations from the prior art.

*Obviousness—§ 103*

20. The combination of a rigid support structure, means for engaging external support, à rotatable turntable and extendible and pivotable boom assembly is disclosed by the Warner & Swasey and Drott references and the Wilson patent 2,462,926. The Warner & Swasey device also has a pivotable tool holder connected to the outer end of the boom. These are upright devices, but the prior art also reveals devices with boom or tool assemblies beneath a support structure with means for engaging external support. These include the Ingersoll-Rand Hydrobreaker and the Cryderman patent 2,781,140, as well as the Russian and Kinney references. Use of a turntable in such a structure is shown in the French 1,180,090 patent.

21. The capacity for vertical positioning of the device which plaintiff relied upon both before the examiner and during trial, even if it is not considered a mere functional claim, is also a characteristic found in the prior art devices. The specifications of the '888 patent reveal that the structural means for achieving vertical positioning of the boom and tool holder consist of the location of the pivot points for the piston and cylinder which connects the boom and turntable and the use of stiffener plates on the boom assembly which limit the angular movement of the boom assembly at the vertical position. (Column 6, lines 25–30). These structural means for achieving vertical position were not new and did not achieve any surprising result. The French patent 1,180,090 discloses a vertical boom with a pivoted tool holder attached to it. The vertical positioning of a pivotable boom was also taught by the Russian patent, Kinney patent, Cryderman patent and the Ingersoll-Rand publication. The Ingersoll-Rand and the Cryderman patent show the use of cylinder and pistons for such positioning. The use of a tool on the end of the vertical boom for demolition and prying operations was shown in the Kinney and Russian patents.

*Differences between the Prior Art and the '888 Claims*

22. The upright prior art references contain all of the elements of claim 1 of the patent except that since the "external support" is the ground, some have no means supplied for engaging support other than wheels. These machines also differ in specific purpose from the patent, though the Warner & Swasey publication shows that a demolition tool can be attached. The Russian, Kinney and Ingersoll-Rand references are all demolition machines; none have turntables and the Russian and Kinney patents show no tool holders or extendible booms. The tool on the Ingersoll-Rand device is not connected to the end of the boom, but to an intermediate rotatable shaft.

---

**2.** The Grant '976 device is not prior art under § 103, for the reasons stated in the conclusions of law, and apparently was considered by the examiner in relation to a consideration of whether the '888 claims differed from the '976 claims only in some unpatentable particular which was obvious in light of the prior art. *See, e. g.,* Application of Ornitz, 347 F.2d 586, 52 CCPA 1467 (1965). Since neither party briefed the possibility of such "double patentings", the Court has not relied upon it.

23. Other than the location of the pivot points to permit vertical positioning, there is no difference between the prior art devices and claims 3 and 4 of the patent. The Warner & Swasey machine shows all of the elements of claim 3 except that vertical positioning is not shown, and the positioning of a boom under a turntable is merely a reversal of Warner & Swasey or Drott and is shown in the French patent. The Ingersoll-Rand device shows a location of pivot points which allows vertical positioning of the boom, but it does not have a turntable or a pivotable tool holder which is connected to the end of the boom.

24. The foregoing analysis of the prior art reveals that structural differences between the prior art and the '888 claims consist either in mechanical expedients or reversal of parts and that use of the combination in the patent claims was one of mechanical choice. The mounting of the boom to the undersurface of a turntable constitutes merely a reversal of parts, particularly in light of the French patent. Even if the "whereby clause" were not considered a functional claim at the point of novelty, the vertical positioning of the boom is a function of the position of the pivot points and stops, and such positioning was evident in prior art machines, including the Ingersoll-Rand device.

25. Although plaintiff, in order to achieve allowance by the examiner, stressed the inability of prior devices to conduct both demolition and prying operations while in a vertical position, such capacity was shown in the Kinney patent, Russian patent and the Ingersoll-Rand device. Although plaintiff's expert, Dr. Romauldi, testified that it would be necessary to strengthen and redesign some of the components of other prior art machines in order to clean soaking pits, the teachings of those machines were available to one of ordinary skill in the art.

*Level of Ordinary Skill*

26. The level of ordinary skill in the art was a man with training in engineering or with experience in designing hydraulic equipment for cleaning soaking pits. Dean Joseph Hogan, Dean of the Engineering School at the University of Notre Dame, concluded that he would expect an engineer of ordinary skill in the art in 1965, having been given the problem of designing a soaking pit machine, to produce a machine as defined in the claims of the '888 patent and that the solution could have been easily achieved even by engineering students in the junior and senior year.

*Scope of the Prior Art—the '396 Patent*

27. The prior art revealed machines with a supporting framework, a pair of extendible outrigger assemblies to position and secure the structure and hydraulic controls for actuating the components; some references revealing this combination are the Wilson and Antos patents and the Bucyrus, Pettibone and Drott references. These devices also showed means for "moveably mounting a tool supporting member of the framework." The Thomas patent 2,623,789, which was before the examiner, describes a means for attaching a drill to a mine-loading cart with telescopic members to keep the tool in position. The examiner also considered the Skendrovic 3,370,654 patent which discloses a suspended soaking pit machine having hydraulic means to secure the machine at its location.

28. Various clamping mechanisms existent in the prior art included the Klausmeyer patent 1,875,016 device for supporting a mobile drill to rails in a machine shop and the White patent 350,090, a reference before the examiner, which discloses a device for gripping the sides of rail tracs to prevent movement of rail cars on the track. The White structure has a cylinder arrangement with pistons.

29. In the original rejection of the claims, the examiner concluded that substitution of rail clamp means as shown in the White patent for motor driven rail engaging means as shown in the French patent was obvious, as was pro-

viding extensible outrigger means as shown by Thomas. In response to this rejection, plaintiff's solicitor added the language "for movement therewith for clamping an external support between the clamping mechanism and the assembly."

### Differences between the Prior Art and the '396 Patent

30. As is apparent from the file wrapper and the foregoing analysis, the prior art devices showed many devices with all of the elements of claim 1 of the patent except the addition of a clamping mechanism attached to the outrigger assemblies. Excepting the references which were before the examiner, the devices were used on cranes and consisted of outriggers with pads on the end to anchor the device to the ground. The Thomas and Skendrovic patents were supporting devices which did not utilize clamps. The clamping mechanisms in the prior art were not attached to outrigger assemblies. The Kinney patent shows the use of a clamping device mounted on an external support to hold the machine against reactive demolition and prying forces, but does not show outriggers.

31. The plaintiff's own '888 device differs from claim 1 of the '396 device in only minor details. The '888 device had adjustable wheels with mechanical screw-down clamps. It did not have hydraulic means to extend the wheels. Although the '888 patent may not be considered a prior art reference against the '396 patent under § 103, the actual machine which was operated on April 2, 1965, constituted public use within the meaning of 35 U.S.C. § 102(b).

32. The other claims are dependent claims which add nothing to the independent claim. Claim 2, calling for use of a cylinder and piston arrangement with clamping means, finds response in the White patent. The Antos and '888 patents reveal the details of claim 3, and the hydraulic systems detailed in claim 12 are found in the Antos and Pettibone references, with the exception of fluid actuated cylinders. Such cylinders are shown in the Warner & Swasey publication.

### Level of Ordinary Skill

33. The same level of skill applies to the '396 patent as was applied to the '888 patent.

### Unsolved Need and the Success and Failure of Others

34. There was no long-standing problem which the '396 patent was designed to cure, but merely the inability of the '888 device to adjust to large variations in pit size.

### The '888 Patent

35. The need for an efficient and economical method for cleaning soaking pits was recognized by those who supervised soaking pit cleaning in the steel industry. Various crane-operated devices such as a breaker attached to a saddle on a crane, were considered non-economical because of loss of valuable crane time. Various demolition devices available for similar clean-out work, such as the Kinney device, were not applicable because they had no means for mounting them to a soaking pit. Crawler-mounted devices such as the Grant-o-matic were economical, but somewhat inefficient because it lifted up when too much pressure was applied, the operator had to be relieved frequently, and the device was a safety hazard because it used propane gas. Many of those who supervised the cleaning of pits were therefore interested in finding an efficient remotely operated device which would have strength against reactive force without causing loss of crane time. However, there was no widespread effort by those in the industry to solve this problem by other than trial-and-error methods, nor was any general effort made to utilize the services of company or independent engineers to design an appropriate machine. The one effort which was made, that of the Bethlehem Steel personnel in conjunction with Ingersoll-Rand, was a successful one. Mr.

McHale, an employee at Bethlehem Steel for 33 years and now superintendent of the soaking pits at its Pennsylvania plant, conducted extensive inquiries in an attempt to locate a machine for remotely cleaning pits and finally made an agreement with Ingersoll-Rand. Ingersoll-Rand, in conjunction with the engineering department at Bethlehem, removed the crawlers from the Hydraboom machine Ingersoll had developed in 1958 and mounted the device on the pit cover carriage of the soaking pits. This machine, which was used between 1964 and 1969 for cleaning pits, includes a support structure, the mechanical equivalent of a turntable, an extendible and retractable boom assembly and a movable demolition tool connected to an axially rotatable shaft at the end of the boom. The support structure is bolted to the pit cover carriage, and the boom is pivotally connected to the support structure. The joint on which the boom pivots allows the boom to swing 180° in two directions, either simultaneously or separately.

36. Damage to pit cover carriages, weight and awkwardness were among the reasons the Ingersoll-Rand machine did not gain acceptance in the steel industry. However, it is clear that the machine was successful at Bethlehem, and McHale considered it a great advance in cleaning pits. It is a remotely operated suspended device, and the boom assembly can be positioned vertically and operated beneath the mechanical equivalent of a turntable for demolition and prying operations. The Ingersoll-Rand tool holder is not pivotally connected to the end of the boom, but the use of the Ingersoll-Rand indicates that the general structure of a suspended soaking pit machine with a boom capable of vertical positioning was known to those of ordinary skill in the art and that the soaking pit did not constitute an environment with unusual engineering obstacles to the design of a remotely operated device. The Ingersoll-Rand machine's use at Bethlehem indicates that the commercial success of the Grant '888 device was not a result of a new conception of soaking pit clean out, but resulted because of the development of a more efficient machine than the Ingersoll-Rand device due to Grant's greater familiarity with previous soaking pit machines such as the Grant-o-matic and the lack of effort by those in the steel industry to design an appropriate machine.

*Fraud*

37. The claims of the '888 patent were rejected by the Patent Office Examiner on page 32 of the file history of the '888 patent, based on the Russian patent and the Kinney patent. In response to this action, plaintiff's counsel misinterpreted the teachings of the Russian patent as to positioning and operation of the tool. (p. 40). The demolition tool shown in the Russian patent, according to the translation, disclosed the feature of being able to dispose the tool at various angles to the floor for demolition purposes. The plaintiff did not have a translation of the Russian patent even as late as 1971.

38. On page 43 of the plaintiff's amendment, plaintiff's patent solicitor stated that the Kinney patent could not be used for prying, so that there was no necessity for clamping down the Kinney arrangement. This patent specified that keeper elements are provided for purposes of preventing the crane carriage from lifting off the rails when the ram encounters considerable resistance. The Kinney publication shows prying operations contrary to the statement made by plaintiff's patent solicitor.

39. On March 28, 1969, subsequent to the closing of the prosecution on the merits, the plaintiff's patent solicitor filed an "Amendment in Lieu of a Rule 312 Amendment." In this Amendment, the plaintiff asked the examiner to consider 29 different patents as pertinent references. Among these were the French patent and the Warner & Swasey patents (Ferwerda 2,833,422 and 2,541,045) which are more pertinent than those relied upon by the examiner.

On May 12, 1969, the examiner stated that he would not make the 29 references of record since the applicant had not complied with § 707.05(b) of the M. P.E.P. Although plaintiff argues that the references were all checked off in pen by the examiner, this certainly does not indicate that the references were actually studied by the examiner since the notice of allowance was sent on April 23, 1969, before the examiner's refusal to make the references of record.

*The '396 Patent*

40. The '888 patent is not a reference listed on the '396 patent. The application for the '396 patent referenced the '888 patent by application serial number in the '396 specification, but made no mention of its relevance to the alleged inventions of the '396 patent. Plaintiff argues that the examiner considered the teachings of the '888 patent application because there is a checkmark by the serial number of the '888 patent application on the Patent Office copy of the '396 patent application. However, there is no mention anywhere in the prosecution of the '396 patent of the teachings of the '888 patent application relating to clamping means, which was more pertinent than any of those relied upon by the examiner. Finally, the plaintiff again, after the Notice of Allowance, filed a 312 Amendment asking the examiner to make of record 29 patent references, including the Kinney patent which was more pertinent than those relied upon by the examiner.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction and venue over the subject matter under 28 U.S.C. § 1338; venue is proper under 28 U.S.C. § 1400(b).

2. Grant is the owner of patent '888 by assignments from the inventors, Louis A. Grant and William H. Bickerstaff, and is the owner of patent '396 by assignment from Louis A. Grant to Grant.

3. Keibler's Type I machine infringes claims 1, 2, 3, 4, 7, and 8 of Grant patent '888.

4. Keibler's Type II machine infringes claims 1, 2, 3, and 4 of patent '888.

5. Keibler's Type I machine infringes claims 1, 2, 3, 5, 6, 7, 8, 9, and 12 of patent '396.

6. The alleged improvements of the Keibler machines over the patents in suit are mere colorable departures, changes in form or inconsequential substitutions that do not avoid infringement. The three stage boom used by Keibler is the structural equivalent of the Grant two stage boom which performs the same functions in substantially the same way to achieve the same results.

7. The claims of the '888 patent do not read literally on the defendant's Type I or Type II soaking pit clean out machines because the boom assembly and tool of the defendant's machines cannot be positioned completely vertically and operated directly beneath the turntable for use in demolition and prying operations. However, infringement of the '888 patent is not countered by this incapability of the Keibler booms. The requirement of vertical alignment in the patent claims is purely functional and an expression of the result obtained by the means described. Since the means described do not recite the structure, material or acts which support the claimed function, the claim is construed to cover the corresponding structure described in the specifications and equivalents of them. 35 U.S.C. § 112. The structural limitations disclosed in the '888 specifications which permit vertical positioning consist of the position of the pivots and one of the stiffener plates on the boom which acts as a stop to limit the angular movement of the boom assembly. The stop on the Keibler machine and the difference in position of the pivots which change this angular movement are additions to the structure which prevents the otherwise sufficient means from achieving the mentioned result. These are clearly minor, insignificant variations from the specification of the '888 patent which do

not prevent the Keibler device from working in substantially the same by the same means to accomplish the same result as the Grant device. One may not avoid infringement by a mere change in position of an operable element when the operations and result achieved are essentially the same as the patented device. Maxon v. Maxon Construction Co., 395 F.2d 330, 335 (6th Cir. 1968).

8. The doctrine of File Wrapper Estoppel is that a patentee narrowing a claim in order to obtain allowance in response to a Patent Office rejection based on prior art is estopped from resorting to equivalents to broaden the scope of that claim beyond the limitations added. Shields-Jetco, Inc. v. Torti, 314 F.Supp. 1292 (D.R.I.1970), aff'd 436 F.2d 1061 (1st Cir. 1971). But even after cancellation of a broad claim through file wrapper estoppel, a patentee is still protected against obvious and exact equivalents of the patented device. Eastern Rotorcraft Corp. v. United States, 397 F.2d 978, 982, 184 Ct.Cl. 709 (1968). Thus, even after the doctrine of file wrapper estoppel is applied, the range of permissible equivalents is sufficient to find that infringement of the '888 patent exists. Defendant does not argue file wrapper estoppel applies to the '396 patent, and literal infringement clearly exists.

*Anticipation*

9. Since Bickerstaff did not reduce the '396 device to practice and his general suggestions for improvement of the '888 device did not suggest the entire combination of elements claimed in patent '396, he was neither the original inventor nor the first inventor. *See* Polye v. Uhl, 328 F.2d 893, 51 CCPA 1067 (1964). All of the credibile evidence indicates that Grant and Bickerstaff were the inventors of patent '888 and that Louis Grant is the inventor of patent '396; the burden of proving that the inventions derived from others was not met.

10. There was no anticipation of either patent by the prior art because the same elements are not found in exactly the same situation and united in the same way to perform an identical function. Anticipation of the '396 patent under 35 U.S.C. § 102(b) is properly considered together with obviousness, since the discovery which is claimed as the invention of patent '396 occurred after the public use of '888 machine on April 2, 1965.

11. A patent is presumed valid. 35 U.S.C. § 282. However, this presumption may be overcome by new prior art which was not considered by the Patent Office, Strzalkowski v. Beltone Electronics Corp., 371 F.2d 237 (7th Cir. 1966), or by prior art which was misinterpreted by the Patent Office examiner, Shelco, Inc. v. Dow Chemical Co., 322 F.Supp. 485 (D.Ill.1970), aff'd. 466 F.2d 613 (7th Cir. 1972), or by prior art which was called to the Patent Office's attention but was not considered by the Patent Office, Koehring Co. v. E. D. Etnyre & Co., Inc., 254 F.Supp. 334 (D.Ill.1966). Claims directed to combination of mechanical elements are closely scrutinized by the Courts, Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950).

12. Skendrovic patent '654 is not prior art under § 103 against patent '888 because the application was filed on November 8, 1965, which is after the date of invention of patent '888. The Grant '976 is not prior art under § 103 against either patent because they are co-pending applications by the same inventor.

13. Defendant relied upon a multitude of prior art references in seeking to establish obviousness, and, as plaintiff argues, this ordinarily tends to strengthen the presumption of validity. However, when the patent office has not considered important contributions to the prior art, even one prior art reference not considered by the patent office can suffice to overthrow the presumption of validity. T. P. Laboratories v. Huge, 371 F.2d 231 (7th Cir. 1966). Important prior art references which were not considered by the patent office

are the Warner and Swasey, the Ingersoll-Rand publication, the French patent and the Cryderman patent as to the '888 patent, and the '888 patent and Kinney patent with respect to the '396 patent. The Grant '888 patent was more pertinent than any of the art considered by the examiner with respect to the '396 patent because it showed clamping means attached to the mechanical equivalent of outriggers "for movement therewith." The Kinney patent showed clamping mechanisms for an inverted demolition machine. The Ingersoll-Rand device and the Cryderman patent were more pertinent than any of the art considered by the examiner for the '888 patent because they indicated the obviousness of the location of pivot points and the Ingersoll-Rand revealed the ability for vertical positioning of a boom in the environment of the soaking pit. The French patent showed use of an inverted combination of turntable, boom and pivotable tool, and the Warner & Swasey showed this combination in a demolition machine with a pivotable boom.

14. In addition, several defects in the prosecution of the patent application weaken the normal presumption because they resulted in omissions and inaccuracies in the materials presented to the patent office. These included inaccurate representations as to the teachings of the Russian and Kinney patents, the citation of numerous references after the examiner's consideration of the application on the merits was closed, and the failure to advise the examiner of the relevance of the teachings of the '888 patent to the '396 application. Although plaintiff's solicitor only spoke of what the Russian patent drawing "appeared" to disclose, it was certainly an inaccurate statement, if not an improper one, in light of plaintiff's duty to give a complete response to the rejection and the failure of plaintiff to obtain a translation. As to the Kinney patent, plaintiff contends that the term "prying" was used to denote the action of the pivotable tool holder on the '888 which was absent in Kinney, but this is inconsistent with the subsequent state-

ment by plaintiff's solicitor during prosecution of the patent that the operative elements did not need clamping devices because Kinney did not involve prying operations, and plaintiff knew or should have known that the representation was inaccurate. The interpretations of the Kinney and Russian patents were crucial to the allowance of the patent claims, as the examiner's reliance upon them in his earlier rejections demonstrate. The plaintiff knew or should have known that it was following an unusual procedure in the prosecution of the '888 patent in filing an "Amendment in lieu of a Rule 312 Amendment." A Rule 312 Amendment is an amendment after the prosecution of the merits is closed and is not permitted as a matter of right, but only on the recommendation of the primary examiner under certain limited conditions. Finally, plaintiff knew or should have known that a mere reference in the specifications was not a sufficient disclosure to the examiner of the teachings of the '888 patent with relation to the '396 patent's clamping means, the feature relied upon most by plaintiff in the prosecution of the application.

15. This evidence falls far short of clear and convincing proof of a deliberately planned scheme involving affirmative dishonesty and provides no sound basis for a finding of knowing and willful misrepresentation of a material matter so as to invalidate the patents in suit. See Mercantile Nat. Bank of Chicago v. Quest, Inc., 303 F.Supp. 926, 933 (N.D.Ind.1969), aff'd. 431 F.2d 261 (7th Cir. 1970), cert. denied, 401 U. S. 956, 91 S.Ct. 977, 28 L.Ed.2d 239. However, the inaccurate and misleading interpretations given by plaintiff in its amendments and the failure to fully disclose the teachings of the '888 patent, together with the questionable conduct of filing a long list of patent references, some of which were more pertinent than the art relied upon by the examiner, after the examiner had closed the prosecution of the merits and issued a notice of allowance, constitute a breach of candor having the effect of preventing the examiner from properly examining the

patent application; such omissions and misrepresentations, whether intentional or unintentional, have consistently been held to weaken the presumption of validity. *See, e. g.,* Shelco, Inc. v. Dow Chemical Co., 322 F.Supp. 485 (N.D.Ill. 1970), aff'd., 466 F.2d 613 (7th Cir. 1971). These circumstances also make it perfectly clear that some of the pertinent prior art was misinterpreted by the examiner and that some pertinent evidence was presented to the examiner too late to be considered by him.

### Obviousness of the '888 Patent Claim

16. Having considered the scope and content of the prior art, the level of ordinary skill in the art and the difference between the claims and the prior art, the Court finds that, within the meaning of 35 U.S.C. § 103, the subject matter claims 1, 3 and 4 of the '888 patent would have been obvious, at the time the invention was made, to a person having ordinary skill in the art.

17. Where the structure of the machine disclosed in the claims and specification of the '888 patent differentiated mechanically from the structures of the prior art, such differences were merely mechanical equivalents, mechanical expedients, or involved reversal of parts from the structures disclosed in the prior art and would have been obvious to one skilled in the art as was established by the testimony of Mr. Fishleigh, Mr. Keibler, Mr. McHale, Dean Hogan, and the affidavit of Mr. Grant himself. The structure was obvious in light of the numerous upright machines evident in the prior art and the Russian and Kinney devices; reversal of parts is not invention where a well-known principle is involved and no new results are obtained. *See* Continental Scale Corp. v. Harrison Wholesale Co., 132 F.2d 463 (7th Cir. 1942). In addition, it would have been obvious to attach a turntable to the Ingersoll-Rand device if desired in place of the piston and cylinder arrangement in light of the French patent and others, and equally obvious to use a pivotable tool assembly in place of the axially rotatable shaft if desired. The "whereby clause" was purely functional language at the point of novelty which adds nothing to the structure since vertical positioning of a boom assembly was well known, and the addition of a pivotable tool holder was an obvious one in light of prior art devices such as the Warner & Swasey machine and Russian patent.

18. The fact that the Grant device provided a use in soaking pits for an old combination and resolved a long-felt need for an efficient device, resulting in great commercial success does not establish unobviousness; these are secondary considerations which do not outweigh the clear import of the scope and content of the prior art and the level of ordinary skill which the evidence revealed in this case.

### Obviousness Re the '396 Patent

19. If one of ordinary skill in the art had been given the "problem" of designing a universal support for a machine, to be suspended over areas of various sizes, it would have been obvious within the meaning of 35 U.S.C. § 103 for such person to make the support extendible in light of the Thomas patent and others. It would also be obvious to an ordinary person skilled in the art, if presented with the "problems" of. upward movement of the machine in response to forces of a tool on the machine, to provide a mechanism for clamping the machine to an external support in light of the White and Kinney patents and others. It was merely a matter of mechanical choice whether to place these clamps on the outriggers "for movement therewith" rather than to use a separate clamping device such as in the Kinney patent.

20. The use of a piston and cylinder arrangement for this purpose would have been obvious in light of the White patent and others, and the use of slidably mounted outriggers was obvious in light of Antos and others. Finally, it would have been obvious to one skilled in the art to provide fluid-actuating con-

trols in light of the Antos, Warner & Swasey and other references.

21. The Court therefore finds that the differences between the subject matter of the asserted claims of the '396 patent and the prior art are such that the subject matter as a whole of claims 1, 2, 3, and 12 would have been obvious to a person having ordinary skill in the art at the time the invention was made.

22. The Court also finds that the patent claims would have been obvious to one of ordinary skill in the art at the time of the public use of patent '888 in light of the disclosures of patent '888. It would have been an obvious expedient to enlarge the slight adjustments possible on the '888 device by using a piston and cylinder arrangement and to use hydraulic rather than mechanical clamps.

23. The Court therefore finds the claims of patent '888 invalid under 35 U.S.C. § 103 and finds the claims of patent '396 invalid under 35 U.S.C. §§ 102(b) and 103. For the reasons stated, it is ordered that plaintiff take nothing by its complaint.