DYK, Circuit Judge,
concurring-in-part and dissenting-in-part.
I agree with the majority that the paten-tee effectively disclaimed coverage of the Keith patent in the specification of the ’580 patent, and that the Keith patent does not anticipate. However, I write separately because I cannot agree with the majority’s affirmance of the district court’s finding of no inequitable conduct.
I
Claim 59 as it depends from claim 11 includes the claim language at issue and states:
A process for inducing and maintaining analgesia in a human being by the trans-dermal administration of [fentanyl base] which comprises transdermally administering to said human being through an area of intact skin,
a skin permeable form of said [fentanyl base] at an analgetically effective rate and continuing the administration of said [fentanyl base] to said human being at said rate for an extended period of time at least sufficient to induce analgesia wherein said extended period of time is in the range of [at least about 3 days] to seven days.
’580 patent (emphasis added). At issue is whether the prior art Keith patent discloses the “skin permeable form” limitation. The Keith patent discloses a trans-dermal patch using a solution of fentanyl citrate. While the fentanyl citrate itself is not skin permeable, such a fentanyl citrate solution also includes some amount of fen-tanyl base, which is skin permeable. The patentee’s contention is that the pH of the Keith solution, which is directly related to the proportion of base and citrate in the solution, is not covered by the patent.
Conspicuously absent from the claims of the patent is any sort of pH limitation. The majority nonetheless finds that there is such a limitation in the patent. First, the majority, like the district court, construes the disputed limitation “skin permeable form” as meaning “fentanyl that is in a form that can pass through the skin, excluding solutions of fentanyl citrate.” *1375 Ante at 1369. The claim language itself does not exclude “solutions of fentanyl citrate.” The majority gets to the exclusion of “solutions of fentanyl citrate” by finding a disclaimer in the specification, which states:
We have discovered that fentanyl citrate, the form in which fentanyl is 'presently administered, has stick a low skin permeability that it is not at all suitable for transdermal delivery even with the use of permeation enhancers. Instead we have found that, in order to obtain the delivery rates noted above, the drug should be incorporated in the transdermal therapeutic system in the form of the base.
’580 patent, col. 3, II. 10-17 (emphasis added). The majority concludes that fen-tanyl citrate was at the time administered by intravenous solution or infusion solution. The question then becomes: what at the time was considered to be a solution of “fentanyl citrate?” The majority determines that such solutions are appropriately defined by their pH. The patent contains a reference to Sublimaze®, the FDA-approved form of fentanyl citrate, stating that fentanyl’s “use as approved by the FDA in the United States is described in the 1984 Physician’s Desk Reference, pages 1027 through 1029 with reference to the drug SUBLIMAZE® manufactured by McNeil Lab for Janssen Pharmaceutica, Inc.” Id. at col. 1, II. 18-22. The referenced Physician’s Desk Reference described Sublimaze® as “(fentanyl) as the citrate” and described the use of “[sjodium hydroxide for adjustment of pH to 4.0-7.5.” (J.A. at 7381.) The majority concludes that the then-presently-administered form of fentanyl citrate thus had a pH of 4.0 to 7.5. A pH within or below that range is thus disclaimed. Since the solution disclosed in Keith had a pH of 6.5 to 7.0, Keith does not anticipate.
This analysis seems to me to be correct and to lead to a finding of no anticipation. I am troubled, however, by the majority’s reliance on the admittedly misleading Gale declaration to support this result. Indeed, I think that the Gale declaration raises substantial questions of inequitable conduct.
II
The declaration of Gale, one of the inventors, was submitted by the patentee during reexamination to support patenta-bility over the newly disclosed Keith reference. It stated, in pertinent part:
9. Because fentanyl has a pK of 8.3[sic], the fentanyl present in the Keith et al. matrix would exist virtually completely in the form of fentanyl citrate. As a result, to the extent that the Keith patent could be considered to disclose making a transdermal fentanyl delivery system by including fentanyl in the diffusion matrices of the Keith patent, such a system would be unsuitable for administering fentanyl at analgetically effective rates.
10.... The ’580 patent at col. 3, lines 6-14 and col. 1, lines 22-25, discloses that the only form of fentanyl that was then being used for medical purposes, fentanyl citrate, is unsuitable for trans-dermal administration because of its low transdermal flux....
11. Thus, in contrast to our disclosure and claims in the ’580 patent, the Keith patent suggests the production of a diffusion matrix containing fentanyl citrate, which we specifically stated in the ’580 patent was unsuitable for trans-dermal delivery, even with permeation enhancers.
Gale Declaration ¶¶ 9-11 (emphases added). The declaration went on to explain the basis for Gale’s belief that a fentanyl citrate system is unsuitable:
*1376 12. Skin permeability studies conducted by ALZA researchers provided the basis for comments in the ’580 patent (col. 3, lines 10-14) regarding the low skin permeability of fentanyl citrate and its unsuitability for transdermal administration. Data generated in these studies supported the conclusion that the skin permeability of fentanyl citrate was too low to permit analgetically effective transdermal fentanyl administration rates to be obtained from reasonably sized transdermal systems. Copies of laboratory notebook entries documenting these studies, are attached as Exhibit 2.
Gale Declaration ¶ 12 (emphasis added). Focusing on the underscored portion of paragraph 12, the district court found that “[t]he statement, although literally true, had the potential to mislead the patent examiner.” Alza Corp. v. Mylan Labs., 310 F.Supp.2d 610, 636-37 (D.Vt.2004) There would seem to be no basis for finding the statement “literally true.” The data in the studies showed that solutions with a pH of 6.5 to 7.0 would work. The district court specifically credited Gale’s trial testimony that the skin permeability of fenta-nyl at the pHs taught by Keith would in fact “ ‘permit analgetically effective trans-dermal fentanyl administration to be obtained from reasonably-sized transdermal systems.’ ” Id. at 635. The district court concluded that “[a] Keith fentanyl trans-dermal system might not have been pretty, it might not have been marketable, it might have contained massive amounts of residual drug, but it could have gotten an analgesic dose of fentanyl across an area of skin.” Id. at 636.
The majority, agreeing with the' district court, suggests that the district court found the statement to be “literally true, because the studies did support the researcher’s conclusions that they should proceed with a base form of fentanyl because a citrate form'would not meet then-goals of maximum flux with minimal total drug.” Ante at 1373-74. But the statement in the Gale declaration has nothing to do with the patentee’s concerns with the amount of drug (“minimal total drug”) being used. It relates only to the unworkability of the Keith disclosure.
Ill
The district court also found that Gale’s misleading statement “was material; the patent examiner based his decision to issue the reexamination certificate on the fact that ‘the citrate form of fentanyl has a very low level of transdermal permeability.’ ” Alza, 310 F.Supp.2d at 637. However, the district court, having found that the patentee made a materially misleading statement during reexamination, concluded that there had been no showing of intent, a finding which the majority sustains. That conclusion in my view rests on an entirely erroneous factual predicate — that the pat-entee’s statement was “true.” Id. Indeed, the district court explicitly found “that as of 1998 when his declaration was submitted, [Gale] knew that the data also showed that fentanyl, at the pHs taught by the Keith patent, would in fact have high enough skin permeability” to make an an-algetically . effective, reasonably-sized transdermal system. Id. at 636. I conclude that a remand is necessary to reconsider the issue of intent, particularly since the district court appears to have found that Gale himself knew that the statement was false, and some of the district court’s other grounds for finding a lack of intent are problematic at best.
The district court found lack of intent because the patentee requested reexamination based on the Keith patent; the question is not whether the patentee has bad intent before the reexamination, but *1377 whether it had bad intent during the reexamination — in concealing the true nature of the Keith disclosure. The district court’s reliance on the disclosure of the data underlying the Gale declaration (the Lee data) is also questionable. We have held that a patentee knowing of a misrepresentation made during prosecution cannot cure that misrepresentation by merely supplying “the examiner with accurate facts without calling his attention to the untrue or misleading assertions sought to be overcome.” Rohm & Haas Co. v. Crystal Chem. Co., 722 F.2d 1556, 1572 (Fed.Cir.1983). Here, the patentee made an untrue assertion and simultaneously submitted accurate facts not in accord with that assertion. Such a submission of accurate facts does not cure a false statement.
Therefore, contrary to the majority, I would set aside the district court’s decision and remand for further factual findings on the intent component of inequitable conduct.